IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br> )<br> )<br>  v.    )<br> )<br>DANA MCINTYRE  )<br> )<br>          Defendant    ) | Criminal No. 21-cr-10162-DJC |

### GOVERNMENT'S SENTENCING MEMORANDUM

The government, by and through its undersigned counsel, hereby submits this Sentencing Memorandum as to defendant Dana McIntyre (the "Defendant"). For the reasons set forth herein, the government respectfully recommends that the Court sentence the Defendant to a term of imprisonment of 32 months, followed by 3 years of supervised release. The government further requests that the Court impose a mandatory special assessment of $700, restitution of $679,156, and forfeiture of the same amount, along with various assets set forth in the plea agreement.

I.   **FACTUAL BACKGROUND**

In early 2020, as the COVID-19 pandemic disrupted everyday life, causing illness, death and economic distress, the U.S. government assembled relief programs to help those whose livelihoods were jeopardized. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted in March 2020 and expanded the Small Business Administration's ("SBA") Economic Injury Disaster Loan ("EIDL") program to provide loans of up to $2 million to small businesses that suffered substantial economic injury from COVID-19. The EIDL program required recipients to use EIDL funds only on certain business expenses, including payments of fixed business debts and payroll. The EIDL application process required applicants to provide information concerning the affected business, including for example, the number of employees,

1

gross revenues, and information about the business owner.

The CARES Act also established the Paycheck Protection Program ("PPP"). Under the PPP, small businesses could apply for loans that were processed and funded by participating lenders. To qualify for a PPP loan, a business was required to submit an application, and supporting documentation that established, among other things, the number of persons employed by the business, and the amount of the business's payroll expenses.

Finally, the CARES Act created a temporary federal unemployment insurance program called Pandemic Unemployment Assistance ("PUA"). PUA provided unemployment benefits for individuals who were not eligible for other types of unemployment assistance, including those who were self-employed, independent contractors, or gig economy workers.

Between March and May of 2020, the Defendant treated these programs as an opportunity to personally enrich himself and submitted multiple false applications to fraudulently obtain pandemic relief funds from the three programs. Presentence Investigation Report ("PSR") at ¶9. As set forth more fully in the PSR, on March 31, 2020, McIntyre submitted two EIDL applications purportedly on behalf of business entities operated by his children. *Id.* at ¶10. Neither of these businesses existed or had the employees or gross revenues that McIntyre claimed, and neither of McIntyre's children authorized him to submit the loan applications. The SBA denied both applications. *Id.* at ¶10-11. On March 31, 2020, McIntyre submitted an EIDL application for "Marley's Pizza Inc.," listing the business's trade name as "Rasta Pasta Pizzeria." *Id.* at ¶12. In that application, McIntyre stated the business had six employees, and gross revenues of $545,649. *Id.* Rasta's payroll account received a deposit of EIDL Advance funds of $6,000 on April 21, 2020. *Id.*

On April 28, 2020, McIntyre filed a claim for federal unemployment benefits with the Massachusetts Department of Unemployment Assistance, in which he falsely indicated that he received no earnings since March 28, 2020.  PSR at ¶13.  In fact, McIntyre continued to operate Rasta and paid himself income between March 28 and his sale of the pizzeria in September 2020. *Id.*  Between April and September 2020, McIntyre submitted weekly certifications to the DUA falsely stating that he had not worked and had not earned income. *Id.*  From this claim and these certifications, McIntyre received at least $17,541 in pandemic unemployment benefit payments. *Id.*

Shortly thereafter, McIntyre filed a PPP application with an SBA-approved lender, Kabbage, for a PPP loan on behalf of "Rasta Foods" for $661,615. *Id.*  On this application, McIntyre indicated that the purpose for the funds was "payroll" and "utilities."  PSR at ¶14. McIntyre's PPP loan application claimed that Rasta had 47 employees and an average monthly payroll of $264,646. *Id.*  Payroll records and tax filings demonstrate that these numbers were fabricated. *Id.*  McIntyre also fabricated documentation to support the employee and monthly payroll representations made in his PPP loan application. *Id.* at ¶15.  The loan was approved, and Rasta's payroll account received a deposit of $661,615 in PPP loan funds on May 7. *Id.* at ¶16.

McIntyre used most of the fraudulently obtained loan funds in ways that were unrelated to the purpose of the PPP program, on expenses entirely unrelated to Rasta's restaurant business or payroll. *Id.* at ¶17.  For example, McIntyre purchased a farm in Grafton, Vermont, along with eight alpacas, and also transferred funds to his personal bank account. *Id.*

II.     SENTENCING GUIDELINES CALCULATIONS

As explained below, the parties agree that the Defendant's Total Offense Level is 19.  At Criminal History Category I, this offense level results in an advisory Guidelines range of 30-37

months of imprisonment.  The government calculates the Guidelines as follows:

| | |
|---|---|
| Base Offense Level, § 2B1.1(a)(1) | 7 |
| Loss greater than $550,000 but less than $1,500,000 § 2B1.1(b)(1)(I) | 14 |
| The defendant is convicted under 18 U.S.C. § 1957 | +1 |
| Acceptance of responsibility § 3E1.1 | -3 |
| **Total Offense Level** | **19** |

As set forth in the PSR, Probation computes the Defendant's total offense level at 18.  PSR, at ¶34.  When analyzing the fraud offense as a standalone count, Probation correctly calculates the base offense level for the underlying offense as 7, because the Defendant was convicted of an offense "referenced to this guideline" [i.e., wire fraud] and the offense has a statutory maximum term of imprisonment of 20 years or more.  *Id.* at ¶24.  Following the Sentencing Commission's directive, as discussed below, this offense level – having been calculated independently, using all instructions and references from the guideline for the underlying offense (i.e., § 2B1.1) – must then be used as the "base" level for money laundering.  Instead, Probation calculates the base offense level as 6.  This is incorrect.

As set forth in the government's objection to the PSR, in adopting § 2S1.1, the section of the Guidelines applicable to money laundering, the Commission made clear that its express purpose was to ensure that "all direct money launderers will receive an offense level that is one to four levels greater than the Chapter Two offense for the underlying offense." *See* Guidelines Supp. to Appx. C ("Commission Policy"), amend. 634, at 235 (Nov. 1, 2001), *available at* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2001/manual/APPCSUPP.pdf ("[T]his amendment provides for three alternative enhancements . . . [that] are designed to (1) ensure that all direct money launderers receive additional punishment for committing both the

4

money laundering offense and the underlying offense.").

To accomplish this mandate, the Commission directs courts to calculate the underlying offense for direct money launderers as follows:

> For direct money launderers . . . subsection (a)(1) sets the base offense level at the offense level in Chapter Two (Offense Conduct) for the underlying offense (i.e., the base offense level, specific offense characteristics, cross references, and special instructions for the underlying offense).

Commission Policy at 229 (emphasis added); *see also* U.S.S.G. § 1B1.5(b)(1) ("An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline."). In other words, § 2S1.1(a)(1) requires an independent calculation using the complete substantive guideline for the underlying offense – including any instructions or references contained therein – before turning to the money laundering guideline. *See United States v. Cruzado-Laureano*, 440 F.3d 44, 48 (1st Cir. 2006) (holding that § 2S1.1(a) requires that "before considering what money-laundering adjustments to apply to [defendant]'s sentence, the court first had to calculate the sentence as it would have applied to the [underlying] extortion counts standing alone, making reference to [the underlying extortion guideline]" before returning to § 2S1.1) (emphasis added); *see also United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010) ("The total Guidelines offense level for such 'underlying offense,' after being independently calculated by applying all appropriate adjustments, and considering any relevant conduct under U.S.S.G. § 1B1.3 . . . is then used as the base offense level for money laundering . . . .") (emphasis added and citation omitted). As the Seventh Circuit stated: "[a]dding levels for 'all' direct launderers is possible only if . . . § 2S1.1(a)(1) plugs the full offense level for the substantive guideline into the 'base' level for money laundering." *United States v. Hodge*, 558 F.3d 630, 637 (7th Cir. 2009). The government is aware that this Court has previously elected to apply the guidelines as set forth by Probation. *United States v. Paul Iwuanyawu,* 1:19-cr-10119-DJC-1, Dkt. 217.

### III.  CONSIDERATION OF SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The sentencing factors set forth in 18 U.S.C. § 3553(a) support the 32-month incarcerative sentence the government is requesting, which is at the low end of the Guideline range as calculated by the government.

#### A.  Nature and Circumstances of the Offense

During a national catastrophe when the federal government and lenders were racing to get loans out to small businesses and in turn, wages to employees who needed the money to survive, the Defendant took advantage of the program by stealing. He made up false information about fictitious companies purportedly operated by his children, and he reported grossly inaccurate information about his own business and work status. He did not merely steal from the government (although that alone is reprehensible); he stole from a program specifically designed to provide a lifeline to existing small businesses and their employees. He stole from a limited pool of money, which ultimately was exhausted, and he harmed not only the government, but also other businesses that truly needed those loans and, consequently, their employees. And he involved his children in his illegal activity by using their names and information in an attempt to fraudulently obtain additional funds meant to help real businesses through real economic disaster.

After he obtained a massive loan for the small pizzeria that he actually operated, the Defendant sold that business and used the loan proceeds to make a fresh start for himself in Vermont. He acquired and upgraded a farm, stocked it with alpacas, bought automobiles, and cut checks to a radio station so he could continue to expound on cryptocurrency and current events on the airwaves. No portion of the loan proceeds went toward keeping a business running or employees paid.

Notably, the Defendant's crime was not a momentary lapse in judgment. He did not submit just one false application. The Defendant systematically filled out fraudulent application documents until he was eventually awarded a loan that he did not deserve. The PUA claims that the Defendant submitted underscore his greed; even after obtaining a six-figure PPP loan, the Defendant continued to falsely collect smaller amounts of pandemic-related unemployment assistance, for no discernable reason other than that the PUA was another emergency program for the Defendant to take advantage of.

### B. History and Characteristics of the Defendant

The Defendant has described significant difficulties that he experienced during childhood, as described in the PSR. But this background does not excuse or explain the Defendant perpetuating a financial fraud as an adult business owner and father. He knew what he was doing was wrong, and he did it anyways. The clear motivation for the crime was greed, and obstacles he faced early in life do not suggest otherwise. The Defendant's personal circumstances do not warrant a variance, let alone the large variance requested by the Defendant.

### C. Need to Avoid Unwanted Sentencing Disparities

The Defendant's requested sentence of 12 months is insufficient under §3553(a). Of course, the circumstances of every case are different, and each defendant must be assessed independently. Generally, defendants who have committed COVID related fraud in this district have received meaningful custodial sentences greater than the 12 months the defendant is requesting. *See, e.g., United States v. Loc Vo,* 22-cr-10286-WGY (24-month sentence for defendant who received over $1.5 million based on multiple fraudulent applications), *United States v. Adley Bernadin*, 22-CR-10110-IT (15-month sentence for defendant who obtained over $400,000 in one fraudulent PPP loan and tried to obtain additional loans); *United States v. Ronald Buie*, 22-cr-10042-DPW (18-month sentence for defendant who obtained SBA loans and PUA

7

payments exceeding $300,000 using stolen and fabricated identities); *United States v. Elijah Buoi*, 20-cr-10130-FDS (39-month post-trial sentence for defendant that submitted fraudulent applications for millions in SBA loans but accessed and spent less than $30,000 in proceeds; defendant had exceptionally difficult childhood and served as a child soldier in Sudan); *United States v. William Cordor*, 21-cr-40016-TSH (33-month sentence for defendant that received $8,000 in EIDL disbursement and who also sought PUA benefits and committed aggravated identity theft); *United States v. Roosevelt Fernandez*, 21-cr10046-RGS (60-month sentence for recidivist defendant who fraudulently obtained $350,000 through EIDL fraud and tax offenses); *United States v. John Casey*, 20-cr-10202-ADB (48-month sentence for defendant who fraudulently obtained over $675,000 in EIDL and PPP funds, and who also committed two unrelated fraud schemes).

### D.   Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant

As the pandemic spread, so too did fraud related to the CARES Act programs and other programs designed to provide critical economic assistance. The government's recommended sentence is appropriate to provide both general and specific deterrence. Actors like the Defendant who defraud these programs not only drain them of limited funding; they also make it more difficult for administrators of government relief programs to get aid to individuals that qualify for and need it. A 32-month sentence will serve as a warning and deterrent to others inclined to exploit similar relief programs in the future. It will illustrate that relief programs are not designed to be cash grabs and that the receipt of relief funds is not a right, but rather a privilege afforded to those who qualify based on true and accurate information.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the government's requested sentence of 32 months, along a special assessment of $700, and the restitution and forfeiture set forth in the plea agreement. It is sufficient, but not greater than necessary, to reflect the seriousness of the offense and the history and characteristics of the Defendant, promote respect for the law, provide just punishment, and afford adequate deterrence.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | JOSHUA S. LEVY<br>ACTING UNITED STATES ATTORNEY |
| By: | */s/ Mackenzie A. Queenin*<br>DAVID M. HOLCOMB<br>MACKENZIE A. QUEENIN<br>ASSISTANT U.S. ATTORNEYS |

Date: August 23, 2023

## Certificate of Service

I, Mackenzie A. Queenin, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

Date: August 23, 2023                                                                 */s/ Mackenzie A. Queenin*