**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| | |
| **v.** | **No. 1:21-cr-10162-DJC** |
| | |
| **DANA L. MCINTYRE,** | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Defendant Dana McIntyre, by and through undersigned counsel, respectfully submits this memorandum in conjunction with his sentencing scheduled for August 30, 2023. McIntyre respectfully requests this Honorable Court impose a sentence of 12 months' imprisonment followed by 36 months' supervised release, a $700 special assessment, enter an order of restitution and a forfeiture money judgment in the amount of $679,156, and order forfeiture as more fully set forth in ¶7 of the plea agreement. In light of his background, the circumstances in which he committed the offense conduct, as well as the other sentences that have been imposed for identical conduct by similarly situated defendants, McIntyre respectfully submits that the sentence proposed herein is "sufficient, but not greater than necessary."

**PROCEDURAL HISTORY**

On May 3, 2021, McIntyre was charged by criminal complaint for wire fraud, in violation of 18 U.S.C. § 1343, and money laundering, in violation of 18 U.S.C. § 1957. He was arrested and made his initial appearance the next day and was released on conditions as well as a $100,000 unsecured appearance bond. The grand jury returned an indictment on May 25, 2021 charging McIntyre as follows: Counts 1-4 – Wire Fraud, in violation of 18 U.S.C. § 1343; Counts 5-7 –

1

Money Laundering, in violation of 18 U.S.C. § 1957. He was arraigned on these charges on June 2, 2021. On October 5, 2021, the grand jury returned a superseding indictment which added an eighth count for aggravated identity theft, in violation of 18 U.S.C. § 1028A but was otherwise the same as the first indictment. McIntyre has been fully compliant with all terms and conditions of his release.

On April 13, 2023, after lengthy negotiations between the parties, McIntyre pleaded guilty to all but the eighth count of the superseding indictment, pursuant to the terms of a plea agreement tendered under Fed. Crim. P. 11(c)(1)(B). Under the terms of the plea agreement, the parties have agreed as to the proper calculation of McIntyre's guidelines sentencing range, but are in disagreement as to sentence. No mandatory minimum applies and the Court is not bound by the terms of the parties' agreement. However, McIntyre has agreed not to recommend a sentence below a 12 months' imprisonment whereas the government has agreed not to recommend a sentence above 32 months' imprisonment.

## ARGUMENT

### I.      Applicable Law

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory.  The Sentencing Reform Act requires the Court to consider guidelines ranges, *see* 18 USC § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care.  18 USC § 3553(a). Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of

sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  *Id.*[1]

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable.  *Gall v. United States*, 552 U.S. 38, 49-51 (2007).  Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all of the factors under 18 USC § 3553(a).  *Id.*  Ultimately, the sentencing judge must select a sentence within the statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress.  18 USC § 3553(a); *see also* 18 USC § 3553(a)(1)-(2).

The First Circuit has summarized the central principles of the post-*Booker* and -*Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility.  In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them.  Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale.  Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II.     Advisory Sentencing Guidelines Calculation

---

[1]  Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines. Sentencing courts previously were forbidden from considering, *inter alia*, a defendant's history and characteristics to the extent that they involved his mental and emotional condition, USSG § 5H1.3; her education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12.  These factors can now support a sentence outside the guidelines.

Pursuant to the plea agreement, the parties believe McIntyre's guideline sentencing range is properly calculated as follows:

| Counts 1s-7s – Grouped per § 3D1.2(d) | |
|---|---|
| Base Offense Level – § 2B1.1(a)(1) | 7 |
| Loss – § 2B1.1(b)(1)(H) ($550,000 to $1.5 million) | +14 |
| Conviction under 18 U.S.C. § 1957 – § 2S1.1(b)(2)(A) | +1 |
| **Offense Level (Subtotal)** | **22** |
| | |
| Acceptance of Responsibility – § 3E1.1(b) | -2 |
| Timely Notification of Guilty Plea – § 3E1.1(a) | -1 |
| | |
| **Total Offense Level** | **19** |
| | |
| **Criminal History Category** | **I** |
| | |
| **Guideline Sentencing Range** | **30-37 months** |

U.S. Probation has determined, over the government's objection, that McIntyre's TOL is properly calculated at 18 which results in an GSR of 27-33 months' imprisonment. U.S. Probation reasoned as follows: Section 2S1.1 is the guideline that governs violations of 18 U.S.C. § 1957 (Counts 5s through 7s). The BOL, pursuant to § 2S1.1(a)(1), is the offense level for the underlying offense from which the laundered funds were derived, i.e. wire fraud, which is governed by § 2B1.1. Since the Statutory Index does not reference 18 U.S.C. § 1957 to § 2B1.1, the BOL under that provision is 6, pursuant to § 2B1.1(a)(2). Adding the 14-level increase for the loss amount, pursuant to § 2B1.1(b)(1)(H), yields a BOL 20 for the money laundering counts. A 1-level increase applied because McIntyre was convicted under 18 U.S.C. § 1957. The offense level is then decreased by 3-levels, pursuant to §§ 3E1.1(a) & (b), for McIntyre's timely acceptance of responsibility, resulting in a TOL 18 and a corresponding GSR of 27-33 months' imprisonment.

Pursuant to the terms of the plea agreement, McIntyre agrees that his offense level was properly calculated in the plea agreement, as reflected in the table above.

### III.    The Requested Sentence Is Sufficient, But Not Greater Than Necessary, To Comply With The Statutory Purposes Set Forth In Under the Sentencing Reform Act

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *United States v. Jiménez-Beltre,* 440 F.3d 514, 518-19 (1st Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodríguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough,* 552 U.S. at 101). That tenet – the "parsimony principle" – instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* (quoting 18 U.S.C. § 3553(a)).

A.  Defendant's Background and Circumstances Leading Up to the Offense Conduct

McIntyre was raised in Beverly alongside three brothers, among whom he was the second eldest. He has no memory of his father who died unexpectedly of a brain aneurysm before McIntyre had turned three. His step-father, who McIntyre's mother dated during his childhood and early adolescence until he was twelve, was anything but the positive male influence his mother had hoped he would be. McIntyre reports that he and his siblings were sexually abused repeatedly by their step-father who treated their mother no more fairly. Despite this abuse, McIntyre's mother sought to keep her relationship with the step-father going. When McIntyre's mother decided that enough was enough and put a permanent end to their relationship, he recalls his mother taking on two part-time jobs in addition to her regular full-time employment—which, even then, was not enough to make ends meet. McIntyre consequently believes that his mother's repeated efforts to renew her relationship with the step-father was primarily motivated by the relentless struggle to financially support four young boys she was otherwise forced to face alone.

Scarcity, determined hard work in the face of it and responsibility to one's family were thus the themes of McIntyre's rough-and-tumble upbringing. This left an indelible impression on him. He recalls that the shame he experienced during grade school for having to present a punch-card at the cafeteria to obtain lunch, which everyone knew only "poor people" were required to do. McIntyre reports that this shame imbued him with a resolve to break what he describes as the cycle of poverty and dysfunction that defined his upbringing. He therefore began working full-time as soon as he was able by joining a co-op program through high school that enabled him to attend school one week and go to work the next; he gave the proceeds from his job(s) to his mother in an effort to help her to provide for his younger brothers.

His goals upon graduating from high school—to start a family and provide for it—were likewise also heavily informed by his experiences as a child. After 10 years went by without having met someone with whom to start a family, McIntyre joined a church that placed a certain emphasis on pairing its congregants for marriage. Soon thereafter, he began dating Karen who he would later marry and together they would have two children, a boy and a girl. He also took non-degree courses in management at Northeastern University and, after a decade of scrimping and saving while working as one of the youngest managers for a national printing franchise with 1,200 locations, he used his schooling and practical experience to start his own landscaping company. As a result of his determined efforts, McIntyre grew the company to employ 35 people across 2 locations (in Salem and Framingham) and deployed dozens of service vehicles.

With his business established, McIntyre began looking for ways to give back. In 2001, he participated in his first mission with Rotaplast International,[2] a Rotary Club program that provides free plastic surgery to children in developing countries who suffer from cleft lip and palate, in

---

[2] Information about Rotaplast can be found at their website: https://rotaplast.org/.

Bolivia; he returned to Bolivia on a second mission, and went to Peru for his third, in the early 2000's. He was also invited to Romania in 2002 by HOPE Worldwide to help spearhead the construction of a soccer field at a group home for orphans. While he was there and during the course of 4 subsequent trips until the project was complete, he developed a close friendship with one of orphans, Marius Ciprian ("Cippi") Samson. *See* Letter of Support by Cippi Samson, attached hereto. According to Cippi, McIntyre began supporting him financially by sending him money so he could attend school. When Cippi turned 17, McIntyre helped him to apply for a student visa and found him a family in Connecticut who could provide Cippi room and board while he attended high school. McIntyre invited Cippi into his own home (at the same time he was working tirelessly to provide for his own 2 children) so Cippi could complete his senior year at, and graduate from, Gloucester High School. Cippi reports he now living the "American dream"— happily married with a good job—which he attributes to McIntyre's selfless efforts.

Unfortunately, much of McIntyre's life from the early to late 2000's was mired in struggle and strife. Despite best efforts dealing with Karen's mounting mental health issues, their marriage eventually reached the point of irretrievable breakdown. When McIntyre filed for divorce in early 2004, he had no idea a consequence of doing so would also be the dissolution of his landscaping business. In addition to the costs of the divorce itself, Karen made a series of baseless complaints against him resulting in restraining orders and criminal complaints he was forced to hire counsel to defend.[3] Although his business experienced enough success to grow as it did, its margins were

---

[3] Undersigned counsel objected, on behalf of McIntyre, to the inclusion of the restraining orders set forth in ¶61 of the PSR. McIntyre understands that the focus of his sentencing is not on these 10- to 15-year-old restraining orders and does not wish to turn his sentencing into an assessment of their validity. To the extent this Court has concerns over them, undersigned counsel would respectfully ask the Court to review the 7-page objection to their inclusion, which has been attached hereto as Exhibit A. In essence, the objection demonstrates that his ex-wife engaged in a pattern of conduct whereby she would obtain a temporary restraining order (oftentimes within days

nonetheless extremely thin. The added legal costs and one summer of poor financial performance were enough to cripple the business and, by 2005, McIntyre was forced to declare bankruptcy. Though he was able to sell the business to a friend which enabled McIntyre to resume operations, it failed to generate the funds necessary to cover his children's medical and educational costs plus the amount of child support and alimony he was ordered to pay his ex-wife. McIntyre was consequently forced to permanently close the landscaping business, which he had built from the ground up beginning at the age of 25.

From 2013 to 2016, McIntyre operated a franchise providing home improvement remodeling. Though the business generated enough income to pay the bills, it was not what he had hoped it to be, namely something for his children to become involved with and eventually take over. He had been harboring the idea of opening a pizzeria so when space became available in Beverly in late 2015, he seized on it. In 2016, McIntyre began operating Marley's Pizza, which is the subject of the instant indictment. Later that same year McIntyre and WBOQ Northshore 104.9FM, a radio station McIntyre advertised the pizzeria through, had an opening for a Saturday morning talk show. McIntyre pitched the idea of a show entitled Cryptomania[4]—which would be the first FM radio show in the country discussing Bitcoin and Blockchain technologies—and was

---

of a scheduled proceeding in connection with their divorce) in an effort to gain leverage over McIntyre during negotiations regarding custody, alimony and child support. Though Karen was awarded child support commensurate with the majority share of the custodial parenting time she was also granted, McIntyre, in fact, assumed nearly all the responsibilities for their children's care and well-being. It was not until his ex-wife began to abdicate the limited responsibilities she was able to take on that he requested a guardian ad litem be appointed to help the family court finally determine their custodial rights. A trial in the probate and family court revealed, as the judge found, that McIntyre had been the primary caretaker of the children (and that Karen's repeated demands for child support were both false and unfounded). It is respectfully submitted that, if anything, these entries serve as a testament to McIntyre's commitment to his children in light of his perseverance in the face of these difficult obstacles.

[4] The show would later be rebranded as "the Crypto Show."

granted the slot. The show aired live, every Saturday morning at 8:30AM. Being the first of its kind addressed to this new, complicated, and quickly-expanding investment opportunity, it gained enormous popularity, prompting the radio station to offer McIntyre an expanded slot at 7:00PM on Saturday evenings. In March 2020, due to McIntyre's success, the station asked McIntyre to also fill the 8:00PM slot; he then created and hosted "Boomer Tunes," which featured rare classic rock tracks from the 1960's and 1970's and aired live after the Crypto Show.

Unfortunately, during this time and through the commission of his offense conduct, McIntyre used marijuana on daily basis and gradually increased his alcohol usage. He reports that at the outset of the pandemic, his drinking became excessive to the point that it began negatively impacting his relationships with his children. Both his marijuana dependency and his heavy alcohol use no doubt seriously impacted his judgment given that their combined height coincided with the commission of his offense conduct.

B.  Offense and Post-Offense Conduct

On March 31, 2020, McIntyre submitted to Economic Injury Disaster Loan ("EIDL") applications on behalf of entities, "Dana's Dank Pies" and "Dante McIntyre Entertainment," purportedly operated by his children. The applications were for loans totaling $51,800. In actuality, neither entity made the gross revenues he reported them to have made in the previous year because neither entity existed. These loan applications were denied. After a month went by during which his business continued to struggle and the pandemic only seemed to be getting worse, McIntyre filed a claim for federal unemployment benefits with the Massachusetts Department of Unemployment Assistance ("DUA"). He falsely reported that he had received no earnings beginning at the end of March 2020, and falsely certified that he had not been working between

April and September 2020 notwithstanding that he continued to operate the pizzeria. During this 5-month span, McIntyre collected $17,541 in DUA proceeds to which he was not entitled.

On April 30, 2020, 2 days after he applied for benefits with the DUA, McIntyre filed an application for a loan through the Payroll Protection Program ("PPP") with Kabbage, a Small Business Association ("SBA")-approved lender on behalf of the pizzeria. In the application, McIntyre properly identified the pizzeria's taxpayer identification number, his personal email address, the pizzeria's phone number and address. However, he falsely indicated on the application that the pizzeria employed 47 people with an average monthly payroll of $264,646; by entering this amount, the neighboring box on the form auto-populated by multiplying the monthly payroll amount by 2.5 resulting in a total loan request of $661,615. He also submitted to Kabbage an IRS Form W-3 (which he had never filed with the IRS) falsely indicating that the pizzeria had filed 47 IRS Form W-2's for its employees and paid of $1.5 million in wages in 2019. To McIntyre's surprise, Kabbage approved the loan on May 5, 2020 and disbursed the amount he requested to his bank. Among other things, McIntyre used the proceeds to: purchase a farm in Vermont for $395,000, fund a family trust in the amount of $209,500, purchase 2 vehicles,[5] purchase 8 alpacas for approximately $10,000, and create and market a new business offering alpaca tours and short-term rentals of a suite at the farm in Vermont. He also transferred various amounts from the pizzeria's business account to his personal accounts.

Prior to McIntyre's arrest, he wrote, directed and produced a part-animated, part-live action short film titled "I Knew Superman," that depicts the highs and lows of a single father and his

---

[5] He purchased one of the vehicles, a 1950 Hudson, for roughly $9,500; its current estimated value is between $10 and $11,000. The other vehicle is a 2007 GMC Sierra. The government returned the vehicle to McIntyre after seizing it, likely due to its extremely limited value.

teenaged daughter.[6] The short concludes with a post-credit tribute to Otto Warmbier, a college student who entered North Korea in a guided tour group, was arrested for subversion, and who died after he was released by North Korean authorities in a vegetative state. McIntyre's film has been nominated for and/or won 17 awards at film festivals across the globe. Though it debuted in 2021, the short continues to gain notoriety—most recently it was nominated for an NAACP Image Award for Best Short Form (Animated) film but unfortunately lost to an MTV Entertainment Studios production.

His arrest on May 4, 2021, which resulted in the immediate cancellation of his radio shows, shocked McIntyre into an acute awareness that he needed to break from the path he was on. Since that day, McIntyre has maintained continuous sobriety—he has used neither marijuana nor alcohol. In so doing, McIntyre has been able to repair the damage he caused to his relationship with his son and daughter while abusing alcohol. In addition, McIntyre tried to find gainful employment apart from the farm he knew he would eventually be required to forfeit. In the months following his arrest, McIntyre was hired by NH Exteriors as an estimator and salesman which had a commission structure that had the potential for him to make many times its base salary of $75,000. He was terminated during his second day on the job after the company learned about the instant charges. McIntyre was then able to find a job in door-to-door sales for cable and internet services which paid exclusively on commission. After knocking on over 300 doors during a 2-week period in January 2022 with minimal results, he decided to pursue other opportunities but soon found that his pending charges were an obstacle he was unable to overcome. He has since found success from the time he has devoted to the alpaca tours at the farm and maintaining the property for AirBnB,

---

[6] Undersigned counsel respectfully ask this Court to view the animated short, which has only a 10 minute runtime. The film can be found online at: https://filmfreeway.com/IknewSuperman.

garnering hundreds of 5-star reviews in the process that speak to his kindness and hospitality. Although this will not be an option for him upon his release, McIntyre has found a construction company of small cottages and cabins willing to hire him in the future, notwithstanding his felony conviction.

Finally, as discussed above, the actual loss in this case is $679,156. Fortunately, the government is likely to recover most of these funds before McIntyre begins serving a term of imprisonment. The government has seized the family trust account McIntyre used the PPP loan money to fund; at the time of its seizure, there was over $109,000 in the account. Further, McIntyre has agreed, pursuant to the terms of the plea agreement, to make best efforts to sell the alpacas (the care and well-being of which are extremely important to him) as well as the farm in Vermont. In an effort to maximize proceeds from the purchase, McIntyre has endeavored to market and sell the farm without a sales agent or closing attorney. He has found one potential purchaser who, upon inspection of the property, has made an informal offer of $460,000 for both the farm/land and the alpacas. Best efforts are being made by McIntyre to close the sale of the property which has appreciated in value due to the improvements he made to it. Between the $109,000 seized by the government and the $460,000 for the farm and alpacas, assuming they sell at the anticipated price, little more than $110,000 (16%) of the original $679,000 loss will remain outstanding.[7]

C.  Circumstances Affecting Relative Culpability

McIntyre's offense conduct occurred in the context of the outbreak of the COVID-19 pandemic. In the weeks leading up to McIntyre's submission of the fraudulent EIDL applications set forth in ¶10 of the PSR, Governor Charlie Baker announced a state of emergency and a string

---

[7] It is respectfully submitted that the fact that the remaining balance McIntyre will be required to repay is eminently "makeable" militates in favor of a shorter sentence insofar as it will help to facilitate his ability to do so more quickly.

of increasingly greater restrictions on the public including limitations on gatherings as well as the closure of all non-essential brick-and-mortar businesses and schools. Although McIntyre's pizzeria was allowed to remain open during the pandemic, the pizzeria remained barely profitable, with razor-thin margins, as it had been before the COVID-19 outbreak. Indeed, the food-industry is considered to have been one of the hardest commercial industries hit by the pandemic due, in part, to the worst food crisis the globe had suffered in 50 years.[8] Further, the amount of fear and uncertainty that existed within the public consciousness cannot be understated. McIntyre was hardly immune to these fears. Instead, the cycle of poverty he was raised in, the fact that he was a single-father of two children who still depended on him for financial support, and the painful knowledge that his third business was teetering on the edge of collapse all combined to make him more susceptible to those fears.

The Office of the Inspector General ("OIG"), whose mandate includes shared responsibility for investigating and safeguarding against fraud in public support programs, noted that it observed "unprecedented" levels of fraud in connection with the PPP program. *See* SBA Inspector General Inspection Report, *SBA'S Handling Of Potentially Fraudulent Paycheck Protection Program Loans*, Report No. 22-13 (May 26, 2022). By as early as August 2020, the OIG had identified "more than 70,000 loans totaling over $4.6 billion in potentially fraudulent PPP loans" through an "analysis of SBA's loan data." As of December 2021, the OIG's fraud hotline received over 54,000 complaints for PPP fraud in comparison to the 52 complaints it had received in all of 2019 for the SBA's guaranteed loan program. *See also* Dilanian and Strickler, *'Biggest*

---

[8] Lee, *Food service industry in the era of COVID-19: trends and research implications*, Nutr Res Pract. 2021 Dec; 15 (Suppl 1) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8636391/); Gursoy, *Effects of COVID-19 pandemic on hospitality industry: review of the current situations and a research agenda*. J. Hosp. Mark. Manag. 2020;29:527–529.

*fraud in a generation': The looting of the Covid relief plan known as PPP*, NBC News (March 28, 2022)[9] (quoting prosecutors who describe PPP loan fraud "the largest in U.S. history").[10]  This begs the question: what caused so many to commit the same crime?

Social science research has found that while instances of fraudulent activity have historically increased during prior pandemics and crises, "coronavirus fraudsters are motivated by a mixture of economic need, created by a decline in business activity and loss of jobs" in addition to "personal greed."[11] Levi and Smith, *Fraud and its relationship to pandemics and economic crises: From Spanish flu to COVID-19*, Australian Institute of Criminology at 42. Others have found that the way the SBA implemented the program, in combination with the loan application approval process designed by the so-called "FinTechs" who underwrote/issued the loans, substantially contributed to the heightened incidence of PPP fraud.

---

[9]  Available at https://www.nbcnews.com/politics/justice-department/biggest-fraud-generation-looting-covid-relief-program-known-ppp-n1279664.

[10] The United Kingdom experienced the same wave of fraud in connection with its own PPP-like program. *See* Thomas and Morris, *A giant bonfire of taxpayers' money': fraud and the UK pandemic loan scheme*, Financial Times (December 19, 2020) (available at https://www.ft.com/content/41d5fe0a-7b46-4dd7-96e3-710977dff81c).

[11] According to the study, "[o]ne of the principal components of the 'fraud triangle' and its variants as a framework for understanding fraud offending… is the capacity of individuals to rationlise [*sic*] their conduct based on personal attitudes and situational pressures." *Id.* at 43. This appears to be, at least in part, what occurred here. Through his interest in finance and investment, as demonstrated by his radio shows, McIntyre maintained certain beliefs about the economy that he used to rationalize is conduct. Specifically, McIntyre believed that because the U.S. authorizes a practice known as fractional banking—a system authorized by the Federal Reserve in which a bank need only keep a fraction of bank deposits available for withdrawal and may use the remainder for lending purposes, thereby effectively "creating" money from such loans—and that his crime would consequently be victimless and lossless.

With respect to the SBA, even before it began lending, OIG warned that the SBA's current internal controls and policies may not be sufficient to catch fraudulent activity.[12] In the weeks and months after the program went into operation, OIG advised the SBA that there were "strong indicators of widespread potential fraud in the program."[13] The SBA, however, dug in their heels, and insisted that its internal controls, as well the loan application processing system, had robust safeguards against fraud. *Id.* at 8. It should have been obvious from the outset that these safeguards would be ineffective—they merely prevented against the issuance of loans to applicants whose identity could not be verified, but offered no way to verify whether the applicant accurately described their business's earnings, number of employees, or how much those employees were paid. After the dust settled, OIG concluded that "the SBA did not have an organizational structure with clearly defined roles, responsibilities, and processes to manage and handle potentially fraudulent PPP loans across the program" because "the agency did not establish a sufficient fraud risk framework at the start of and throughout PPP implementation."[14]  Further, "lenders were not always clear on how to handle PPP fraud" because the SBA failed to provide "lenders sufficient specific guidance to effectively identify, track, address, and resolve potentially fraudulent PPP loans." *Id.* OIG estimates that the "SBA disbursed over $200 billion in potentially fraudulent

---

[12] *See* SBA Inspector General, *White Paper: Risk Awareness and Lessons Learned from Audits and Inspections of Economic Injury Disaster Loans and Other Disaster Lending*, Report No. 20-12 (April 3, 2020).

[13] *See* SBA Inspector General Management Alert, *Serious Concerns of Potential Fraud in Economic Injury Disaster Loan Program Pertaining to the Response to COVID-19*, Report No. 20-16 (July 28, 2020) at 2.

[14] *See* Report 22-13, cited *supra*, at 3.

COVID-19 EIDLS… and PPP loans," meaning "17 percent of all COVID-19 EIDL and PPP funds were disbursed to potentially fraudulent actors."[15]

Similarly, the House's Select Subcommittee on the Coronavirus Crisis issued a staff report explaining how certain FinTechs (and Kabbage, the lending institution at issue here, in particular) greatly contributed to incidence of PPP loan fraud. *See* Staff Report, *"We Are Not the Fraud Police": How FinTechs Facilitated Fraud in the Paycheck Protection Program* (Dec. 2022).[16] Key findings of the subcommittee, which was based largely on internal communications within Kabbage, include:

- **Kabbage, which facilitated over 310,000 PPP loans, implemented a system that confused and concerned employees and financial institutions.** Multiple employees expressed concern about Kabbage's loan review process, with one employee informing her supervisor that she was **"really uncomfortable with the review procedures"** for loans and expressing her belief that **"the level of fraud we're reviewing is wildly underestimated."**

- **Kabbage approved loans with clear indicators of likely fraud, partly because the program imposed minimal risk on lenders who approved questionable applications.** In one exchange, a Kabbage risk manager supervising fraud specialists told his team that "a fundamental difference" between the level of diligence applied in the PPP, as opposed to normal lending by Kabbage, was that "the risk here is not ours – it is SBA's risk."

- **As fraud surged in the program, Kabbage reduced its full-time fraud prevention staff.** Between May and June of 2020, during the height of the PPP, Kabbage reduced its risk and account review teams, which were primarily responsible for fraud reviews, by approximately half. After American Express acquired the majority of Kabbage's assets in October 2020, the PPP loan portfolio was

---

[15] SBA/OIG, *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape*, Report No. 23-09 (June 27, 2023) at 2.

[16] Available at https://coronavirus-democrats-oversight.house.gov/sites/democrats.coronavirus.house.gov/files/2022.12.01%20How%20Fintechs%20Facilitated%20Fraud%20in%20the%20Paycheck%20Protection%20Program.pdf.

> transferred to a minimally-resourced spin-off entity. That company continued to fund tens of thousands of loans while retaining only one full-time anti-fraud employee.

*Id.* at 6 (emphases in original). The more Kabbage lent, the more it would receive in grant money from the SBA. Further, since the SBA guaranteed each PPP loan it consequently bore all risk associated with them. Kabbage was therefore incentivized to issue as many loans as it could— fraudulent or not. It then sold all its assets to American Express *except* for the liability on the loans which it retained in what was essentially an unstaffed shell corporation that quickly went bankrupt. *See also* Griffin et al., *Did FinTech Lenders Facilitate PPP Fraud?*, J. Fin. 78:3 (February 7, 2023).[17]

McIntyre knows and understands that none of the foregoing excuses the dishonesty for which he bears full responsibility. However, the sentencing guidelines ostensibly offer recommended ranges that appropriately reflect the relative culpability of a given defendant in the "mine-run" of cases. *Kimbrough v. United States*, 128 S. Ct. 557, 575 (2007). The foregoing demonstrates that McIntyre's is hardly the mine-run fraud case. The typical fraud defendant's actions are primarily motivated by greed, not fear and duress. The typical fraud defendant abuses good faith and fair dealing on an unwitting victim in contrast to the victim here, Kabbage, who not only was aware the fraud was ongoing, but actively invited it and even benefitted from it.[18] The mindset in which McIntyre committed the fraud, coupled with the victim practically having invited

---

[17] Available at https://onlinelibrary.wiley.com/doi/full/10.1111/jofi.13209.

[18] Indeed, it can be fairly stated that public awareness that certain Fortune 500 companies and major restaurant chains received EIDL loans for which they were not eligible likewise contributed to aberrant behaviors by those having no prior disposition to engage in similar behavior. While not excusing such conduct, it is respectfully suggested this does provide additional perspective.

his commission of it, reduces his relative culpability in comparison to the average fraud defendant and therefore demonstrates the appropriateness of a below-guidelines sentence.

> D. Comparative Sentencing For Pandemic Relief Fraud

From mid-2020 through the present, the Department of Justice has initiated prosecutions against more than 100 (likely more) individuals for the submission of fraudulent EIDL and PPP loan applications. Undersigned counsel have attempted to locate as many of these cases as possible in an effort to provide the Court a sense of how sentencing for this form of fraud has been handled on a national scale. Using the search function for press releases maintained on the DOJ's website, undersigned counsel were able to find and review the case docket for 57 sentenced defendants. The name, docket number, intended loss amount (the amount applied for by the defendant) and actual loss amount (the amount actually disbursed by the lender to the defendant) and the sentence imposed for each of these 57 defendants has been set forth in a spreadsheet, attached hereto as Exhibit B.

Critically, the unlawful activity underlying each of these cases—submission of loan applications which fraudulently overinflate the amount of payroll or altogether fabricates the existence of a corporate entity—is not only identical across these cases but is identical to McIntyre's unlawful conduct here. Given the identity of offense conduct, the sentences imposed on these cases would seem to be a useful guide to this Court when fashioning a sentence that avoids an unwarranted sentencing disparity.

Specifically, the outcomes of these cases demonstrate that the sentence requested herein of 12 months' imprisonment is in line with national averages. The average sentence across these 57 defendants is approximately 57 months, the average intended loss is approximately $5.9 million and the average actual loss is approximately $3.4 million. Put another way, the national average

reflects that 1 month is, on average, imposed for every $107,000 (roughly) of intended loss, or for every $62,000 (roughly) of actual loss. The sentence recommended herein of 12 months actually exceeds these national averages. If anything, imposition of anything beyond the sentence requested herein would create a disparity that is difficult to square given McIntyre's background and circumstances.

Finally, it is respectfully submitted that 2 of the cases identified by the government in its memorandum lend greater support to the imposition of the sentence requested herein. In *United States v. Loc Vo*, the defendant received $1.5 million in fraudulent loan disbursements—more than double what McIntyre received. To the extent loss is a rough proxy for culpability, as contemplated by the guidelines, this Court would be well-justified in imposing a sentence on McIntyre half as long as the one imposed in *Loc Vo*, namely 12 months' imprisonment. Similarly, in *United States v. Bernadin*, the defendant received a 15-month sentence for a $400,000 intended loss. Granted, the sentence requested herein is more favorable in light of McIntyre's loss amount in comparison to *Bernadin's*. However, what the sentence in *Bernadin* illustrates is how disproportionately (and unjustifiably) higher the government's recommended sentence of 32 months if one were to use intended loss amount as a proxy for comparative culpability between defendants. This is further illustrated by the 39-month sentence imposed in *United States v. Boui* which involved an intended loss of $2 million. The government recommends here a sentence only 7 months less severe than the one imposed in *Boui* notwithstanding that the defendant in that case not only *did not* accept responsibility and went to trial, but caused an actual loss more than 3 times the amount actually caused by McIntyre. True, the government was able to recover almost all of the proceeds in *Buoi*, but the same will be true in this case once the Vermont farm McIntyre purchased is sold (something

McIntyre is actively attempting to do in an effort to redress some of the injury he caused) and the proceeds forfeited.[19]

E.  Proposed Disposition & Justification

McIntyre respectfully submits a sentence of 12-months' imprisonment, followed by 3 years of supervised release, as well as both restitution and forfeiture as set forth in the plea agreement is amply sufficient to satisfy the aims of the Sentencing Reform Act. McIntyre's background as a hard-working single-father of 2, who has overcome many obstacles along the way and has made truly remarkable, hands-on contributions to those less fortunate, reflects that the criminal activity he committed in 2020 is never to be repeated. This conclusion is buttressed by the circumstances in which he committed his crimes—in the midst of something as extreme as the COVID-19 pandemic, just as his alcohol use was at its worst. Specific deterrence is simply not among the aims that need be achieved by the sentence this Court must fashion. Similarly, given McIntyre's voluntary, independent efforts to achieve and maintain his sobriety, there is little need for the incarcerative portion of his sentence to be of a duration that facilitates rehabilitation.

As for general deterrence, what the public will see from the instant prosecution, regardless of whether this Court imposes either of the parties' recommendations or something different is that someone who commits disaster relief fraud will be discovered, investigated, prosecuted, and imprisoned. The public will see that any assets derived from the crime will be frozen, that they will, in fact, do prison time, and that when they are released they will likely need to restart their

---

[19] It is also respectfully noted that the Judiciary Sentencing Information (JSIN) included in the PSR establish an average sentence of 21 months for defendants convicted of fraud with an offense level of 18. As just discussed, the instant crime is not within the heartland of fraud cases presumably like those who were sentenced to produce that average. However, the JSIN statistics are nonetheless probative of the proposition that an unwarranted sentencing disparity would result from a sentence in excess of that average, even before consideration of the myriad 3553(a) factors in favor of a below-guidelines sentence, presented herein.

livelihood and finances from scratch while making restitution payments across 3 years of supervised release. The foregoing are the consequences of both the defendant's and government's recommended dispositions, if imposed; the only difference is the duration of imprisonment—12 months vs. 32 months. The deterrent effect of the sentence recommended by the government over-and-above the deterrent effect inherent to the defendant's recommendation is *de minimus*.[20] To find otherwise would require some basis to believe that a would-be offender would not be discouraged by a 12-month term of imprisonment plus all the other consequences, but somehow would be discouraged from committing the crime upon hearing the term of imprisonment was less than 2 years longer. The financial and reputational cataclysm occasioned by the prosecution and conviction itself, particularly when coupled with a full years' loss of liberty, is enough for any would-be offender to immediately conclude "not worth it."

This, essentially, leaves punishment/retribution as the remaining aim of sentencing for this Court to consider. Undersigned counsel believe anything more than 12 months is simply gratuitous at this point. From a financial perspective, McIntyre has nothing. He will be released from prison over the age of 60 with the difficult task of having to figure out how to survive as a convicted felon. He has no parents, no safety net, no one to lend him a hand; he instead has 2 children who continue to derive financial support from him. Further, the reputation he cultivated within the community throughout his life is forever tarnished and his future in radio is now finished. At the same time, the actual loss suffered by Kabbage is next to nothing. Similarly, once the Vermont farm is sold, the government will largely be made whole. Thus, on the one hand, the harms suffered

---

[20] At the same time, a sentence of a similar duration as the one proposed by the government is undoubtedly counter-productive as it will delay and potentially inhibit McIntyre's future ability to repay the remainder of restitution more quickly by depriving him a further 20 months at peak earning-potential.

by the victims of McIntyre's offense conduct are, relative to most other federal financial crime victims, not terribly great. On the other hand, McIntyre is subject to significant, life-altering non-carceral consequences by virtue of his conviction and the other required aspects of his sentence. Undersigned counsel respectfully ask: in what way is 12 months insufficient? Does McIntyre truly "deserve" more time in prison for his conduct? From a pure retribution analysis, the decision to impose 12 months versus some other period of time is entirely discretionary—neither would be "right" or "wrong" in any real objective sense. It is respectfully submitted that the best way to ensure that this discretionary decision does not begin to appear arbitrary is to anchor it to the way like-defendants have been sentenced for identical conduct across the country since these prosecutions first commenced in 2020.

Up until 2019, we see a hard-working single parent that has genuinely tried to improve the lives of others, especially those less fortunate. Undersigned counsel are proud to represent someone with his history. The attached letters of support all describe the same, caring, hard-working person and are each authored by persons who are surprised McIntyre would commit these crimes in light of what they know of him. In contrast, McIntyre committed his offense conduct in some of the most difficult circumstances we all faced collectively. The sentence requested herein appropriately balances each of these myriad considerations.

## CONCLUSION

In sum, McIntyre respectfully requests this Honorable Court impose a sentence of 12 months' imprisonment followed by 36 months' supervised release, a $700 special assessment, enter an order of restitution and a forfeiture money judgment in the amount of $679,156, and order forfeiture as more fully set forth in ¶7 of the plea agreement. He further requests this Court make

a judicial recommendation he be designated to a facility as close to his family in Massachusetts as possible and that this Court permit him to self-report to the facility so designated.[21]

Dated: August 25, 2023                     Respectfully submitted,
                                           DANA L. MCINTYRE
                                           By and through his attorneys,


                                            /s/ *R. Bradford Bailey*
                                           R. Bradford Bailey, BBO#549749
                                           Adamo L. Lanza, BBO#689190
                                           BRAD BAILEY LAW, P.C.
                                           44 School Street, Suite 1000B
                                           Boston, Massachusetts 02108
                                           Tel.: (781) 589-2828
                                           Fax: (857) 265-3184
                                           dan@bradbaileylaw.com



### Certificate of Service

I, R. Bradford Bailey, hereby certify that on this the 25th day August 2023, I caused a true copy of the foregoing *Memorandum in Aid of Sentencing* to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

                                            /s/ *R. Bradford Bailey*
                                           R. Bradford Bailey

---

[21] In the event this Court decides to impose a sentence in excess of 24 months' imprisonment, McIntyre respectfully requests this Court also include in the judgment a judicial recommendation that he be placed in the Bureau of Prisons' 500-Hour Residential Drug Abuse Program and designated to a facility which offers the program.